**UNITED STATES of America,**
**Appellee,**

v.

**Charles HOOKS, Appellant.**

**No. 15199.**

United States Court of Appeals
Third Circuit.

Argued Sept. 21, 1965.

Decided April 22, 1966.

Byrd R. Brown, Pittsburgh, Pa. (Utterback, Brown & Harper, Pittsburgh, Pa., on the brief), for appellant.

James P. McKenna, Jr., Asst. U.S. Atty., Pittsburgh, Pa. (Gustave Diamond, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN, HASTIE and FREEDMAN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant was convicted under seven counts of an eight count indictment charging violations of various federal statutes concerning the transfer of narcotic drugs. There was a direction of judgment of acquittal on the seventh count at the end of the Government's case.

The first count of the indictment charged that defendant unlawfully transferred to George Emrich, Narcotics Agent, 15.900 grams of marijuana, not in pursuance of a written order of Emrich and on a proper form. The second count dealt with the same drug as in the first count, the offense alleged against defendant being that he unlawfully transported and concealed and facilitated the transportation and concealment of the above mentioned marijuana which had been acquired and obtained without having paid the required tax and which tax defendant as transferee was required to pay.

The third and fourth counts of the indictment had to do with a similar sale of heroin by Hooks to the agent at the same time and place as the above marijuana sales.

The plenary proof as to the committing of these offenses and the others named in the indictment by defendant was given by George Emrich, who at trial time was the agent in charge of the Pittsburgh office of the Treasury Department, Bureau of Narcotics. Mr. Emrich said he was thirty-nine years old, married, had two children and had been a Narcotics Bureau agent just short of sixteen years. During the middle part of 1963, the critical period of the offenses involved, he was working in Pittsburgh as an undercover agent. He testified that he knew the defendant, had first contacted him by telephone on May 2 or 3, 1963 and had talked with him in person many times after that. He represented himself to Hooks as a buyer of narcotic drugs from various people, mentioning Gloria Black and Edward Everetts by name. He told defendant that those two people had told him they had secured drugs from him and Estrella Byrd. He told defendant that during the time he had purchased those drugs from Gloria Black and Edward Everetts, "We had gone to his place of business, the Gateway Dinette * * * and also to his home at 2122 Forbes Street." The agent talked with defendant on June 1, 1963 and said that "The defendant advised that he could furnish me cocaine and marijuana, and asked me to call him the next morning." On June 4th, after other telephone calls, defendant told Emrich to meet him at The Starlight Lounge. Emrich parked his car outside that place. Defendant came out, got into the car and told Emrich to drive away from the area. According to Emrich, as they drove, defendant was looking back. Defendant later told him to stop and gave him two packages. One contained tin foil pieces of paper. Emrich opened one of these and it contained what appeared to be marijuana. The other package was nine packets of heroin. Emrich told defendant this was one short and the latter said "he was sorry, that he would make it up the next time." Emrich gave him in official funds the agreed price of $75 for the heroin and $50 for the marijuana. The original packages of marijuana and heroin were properly identified by the witness and admitted into evidence.

The fifth and sixth counts of the indictment charged the defendant with unlawfully selling approximately 4.470 grams of cocaine not in or from the original stamped package to Emrich. The sixth count charged Hooks with selling the same drug to Emrich not in pursuance of a written order, etc. Regarding these offenses, the latter testified that

he called Hooks on June 12th as they had arranged between them. He told Hooks he was going to be in Pittsburgh and wanted to purchase some cocaine. Hooks told him to call back that evening and that they could make arrangements then. Emrich did so and Hooks told him to meet him at 11:30 that night at the Pennsylvania Railroad Station. Emrich said that Hooks had told him at their first meeting that he could furnish an ounce of cocaine for $350. He told Hooks that was the quantity he wanted to obtain. The two met, Hooks said "it would take at least another hour." Hooks returned about 2:30 A.M. He joined Emrich in his car and asked him "to drive from this lot and drive in the area." As Emrich did this, Hooks "took a small white jar from his pocket and took a road map off the sun visor. He opened up the jar and he dumped this alleged cocaine in the road map. And he showed it to me. And then, he replaced the contents. And, by this time we had driven back, across from this lot at the Pennsylvania Railroad Station. He gave me this bottle and I gave him $350 in official funds." Emrich said that later in the presence of Agent Gulich he placed the contents of the bottle in a substitute container, an envelope, sealed it and sent it by registered mail to the United States Chemist in Philadelphia. The envelope and its contents were admitted into evidence. He retained the original bottle and produced that in court.

The eighth count of the indictment charges that on July 17, 1963 Hooks, being a transferee required to pay the transfer tax, transported and concealed and facilitated the transportation of approximately 150.245 grams of marijuana acquired and obtained without having paid such tax.

On the fundamental proof regarding this, Agent Emrich said that after June 13, 1963 he and Hooks talked on the telephone several times and met by arrangement on July 17, 1963. The witness stated that Hooks told him he had no heroin "but he had cocaine. And, also,

that marijuana was in short supply." The witness said:

"And, I told him that the cocaine, that the quality had been very good, but it was so expensive that I didn't want to purchase more. He then said that he could furnish me $5-bags of marijuana, about 30 of them for $100, which he said wasn't a very good deal but was the best he could do.

\* \* \* \* \* \*

"He then asked me to follow him back to his lounge, the Gateway Lounge. He said he would see if he could do any better.

"When we got back there, I parked the car and he went in and came out. He said that he would give me 80 $5-bags for $200. And, I asked him how long it would take and he said not more than a half hour.

"So, I said all right and I left the area, and returned at about 9:20 P.M. and parked near his lounge. He came out carrying a large brown paper bag and he got in the car and he asked me to drive from the area.

"About two blocks away, I parked the car and he gave me this brown paper bag. I opened it. There were many, many envelopes inside. Some were white—small white envelopes—and some were brown—small brown manilla envelopes—and there were also some foil packages.

"I opened up several, and the contents appeared to be marijuana. Then I drove him back to his nightclub.

"Q. Did you at that time pass any consideration to the defendant for this substance?

"A. Yes. After I had examined the contents, I gave him $200 in official funds."

The agent testified in detail about sending the material to the Government chemist, etc. The material in its envelope was admitted into evidence.

Narcotics Agent Gulich was a witness for the Government. He testified that on each of the occasions when Agent Emrich met with the defendant as he stated,

he, Gulrich, observed the meetings. He did not hear the conversations between them. He affirmatively stated that the only persons present at those meetings were Emrich and the defendant. He also detailed the procedure by Emrich and himself with the narcotics received by Emrich from Hooks. The drugs were weighed, sealed, initialed by Emrich and mailed by registered mail to the United States Chemist at Philadelphia.

Martin A. Anderson was a witness for the Government. He is a Treasury Department chemist, so employed for the last thirty-five years. For the last eleven years he has made analyses of at least 200 purported narcotic drugs a year. He examined all of the purported narcotics purchased by Emrich as above outlined. He found that they were marijuana, heroin and cocaine as represented.

Roger J. Weppelman, a Government witness, stated that he is Chief of the Special Procedures Section of the Internal Revenue Service at Pittsburgh. He was testifying as the representative of the District Director of Internal Revenue for the Western District of Pennsylvania. He said there was no record on file of application by Hooks for the mandatory stamp in order to deal in the sale or transfer of marijuana. He also testified to a record of an unpaid assessment upon Hooks for transfer of marijuana.

The defense consisted of testimony by the defendant. He admitted transferring the above referred to narcotic drugs to Agent Emrich. He said:

> "I didn't sell them. I merely was doing it for him. He gave me the money."

Then followed these questions and answers:

> "Q. Did he give you money?
>
> "A. Yes, he did. On several occasions he gave me money.
>
> "Q. What was his reason for this? Did he explain his reason for wanting you to secure drugs for him?
>
> "A. Yes, he did.
>
> "Q. And what was that reason?

> "A. His reason was to stop the traffic of drugs.
>
> "Q. And, he was going to stop it by having you secure drugs and sell them to him?
>
> "A. Not selling them to him. It was to get him, you know, to meet people, to take him to people.
>
> "Q. Well, he couldn't have very well met people if there was no one else present on those occasions.
>
> "A. It was people present on some of the occasions, and some it wasn't."

On this vitally important part of the case the Court properly charged the jury that if it believed the evidence offered by the Government as to the transfers of the drugs "and if you find this beyond a reasonable doubt and believing the testimony, then you would find that so far as the acts are concerned the essential requirements of the offenses have been established." In a strikingly fair charge the Court went on and affirmatively stressed the following:

> "But, this in and of itself, the performance of the acts in and of themselves, does not establish a crime under our law. The serious dispute that had arisen in this case has to do with the intent on the part of the defendant in performing these acts. Even though you may find that the essential elements as to the performance of the acts have been established beyond a reasonable doubt, you must go further if you are to convict the defendant in this case on any or all of the counts of the indictment.

> *     *     *     *     *     *

> "Now, the essential element of the offenses charged in all of the counts of the indictment which must be established beyond a reasonable doubt, and which is in serious dispute and which will be the crux of the decision that you must make, is whether or not in substance the transfers made by the defendant were made by the defendant to George Emrich and whether they were unlawfully made. Now, if you accept the theory of the defendant that

it was not his intention to sell to George Emrich, but rather to acquire for George Emrich, then there is not such an unlawful transfer as could be the basis of a conviction in this case, even though there may have been transfers."

At the end of the charge, the Court asked counsel, "Have I omitted anything? Have counsel any requests for further instructions?" The defense attorney answered, "No, your Honor." The District Attorney said, "I have nothing, your Honor."

It is in the record that Hooks had sometime previously pleaded guilty to trafficking in narcotics or possession of narcotics. He also had a substantial record of other felony convictions.

■ There are other points argued on behalf of appellant. These are of little, if any, substance. The incident with reference to Gloria Black was properly before the Court and properly disposed of by the Court. We find no wrong to defendant arising out of this.

The objected to statement by Emrich to Hooks in introducing himself over the telephone was stricken from the record by the trial judge and not further pursued. There is no error in this connection.

We find no reversible error in the summation of the United States Attorney. United States v. Georgia, 210 F.2d 45 (3 Cir. 1953) has no applicability to the case before us.

■ The argument as to "failure of proof that the Government's agent did not have a written order for the transfer of narcotics as alleged in the indictment herein" is of no merit and does not warrant discussion.

Finally complaint is now made regarding the Government exhibits in evidence going to the jury. The defense had one suggestion concerning these "that in reviewing the exhibits that they [the jury] should not take any of the statements contained in the envelopes or on the envelopes as being in evidence." The Court covered this at length and to the complete satisfaction of counsel for there was no objection noted by either side to it.

■ The only substantial issue in this trial was whether the admitted transfers of the drugs were illegal sales by Hooks to Emrich or whether Hooks "merely was doing it for him [Emrich]" to help the latter in his endeavors to "stop the traffic in drugs" as he said, or for some other allegedly lawful reason. The trial judge, at every stage of the proceedings, saw to it that defendant had a completely fair trial. We find no prejudicial error. The evidence justified the conviction.

The judgment of the District Court will be affirmed.